## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 1099 | **DATE** | 3/18/2004 |
| **CASE TITLE** | United States v. Renken | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Government's Motion in Limine to Admit Defendant's Confessions/Defendant's Motion to Suppress

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, the government's motion is granted in part and denied in part. Defendant's first confession shall be suppressed, but his second confession shall not be suppressed and shall be admissible in evidence.

(11) [For further detail see order attached to the original minute order.]

| | | | | | | | Document Number |
|---|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | | | |
| | No notices required. | | | | | | |
| | Notices mailed by judge's staff. | | | MAR 22 2004 | | | |
| | Notified counsel by telephone. | | | date docketed | | | |
| ✓ | Docketing to mail notices. | | | | | | 68 |
| | Mail AO 450 form. | | | docketing deputy initials | | | |
| | Copy to judge/magistrate judge. | | | | | | |
| | aed/lc | courtroom deputy's initials | | date mailed notice | | | |
| | | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02 CR 1099 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| Henry C. Renken, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Henry C. Renken was charged in a two-count indictment with bank robbery

and use of a dangerous weapon in connection with the commission of said offense, in violation

of 18 U.S.C. §§ 924(c)(1)(A), 2113(a) & (d).

On January 30, 2004, this court held a hearing concerning the voluntariness of statements

made by defendant to government agents in the late evening hours of November 13, 2003 and

early morning hours of November 14, 2003. The government's motion *in limine* to admit

defendant's confessions is now before this court. Further, this court, *sua sponte*, has

reconsidered defendant's July 3, 2003 motion to suppress statements. For the reasons set forth

below, defendant's initial oral statement ("first confession") shall be suppressed, but his

subsequent oral and written statements ("second confession") shall not be suppressed and shall

be admissible in evidence.[1]

---

[1] On July 3, 2003, defendant moved the court to suppress his statements. On July 9, 2003, the
court denied defendant's motion on the grounds that it was untimely filed. However, the voluntariness of
defendant's statements was subsequently addressed by the parties at the January 30, 2004 hearing and in
their February 4, 2004, written submissions to the court.

## I.    Relevant Facts[2]

### A.    The Bank Robbery and Initial Investigation Thereof

At approximately 4:45 p.m. on November 13, 2002, the Northside Community Bank in Gurnee, Illinois, was robbed by a tall male who wore an olive green parka and utilized a firearm in connection with the robbery. The robber made his escape by bicycle.

An investigation followed, in which numerous law enforcement agencies participated, including: the Federal Bureau of Investigation ("FBI"); the Lake Bluff Police Department; the Gurnee Police Department; the Lake County Sheriff's Department; and the Bannockburn Police Department. Ultimately, the FBI led the investigation; it was Special Agent Daniel McCune's case, although his supervisor, Special Agent Gary Kissinger, was technically in charge.

The investigation led the police to the vicinity of the North Shore Sanitary District, where they discovered an abandoned bicycle. Located near the bicycle was a Chevrolet Blazer. A bloodhound subsequently scented a path from the bicycle to the Blazer. Public records revealed that the Blazer was registered to Susan (Halle) Renken, whose address was 412 MacLaren Lane in Lake Bluff, Illinois. Further research indicated that defendant also lived at the address. Based on their investigation, the FBI agents and police officers (collectively, "the agents") concluded that they should go to defendant's house.

---

[2] The court makes these findings of fact solely for purposes of resolving the issues presented by the parties' respective motions. These findings are based on the evidence presented at the January 30, 2004 hearing, at which only FBI Special Agent Daniel McCune, as well as defendant's wife, Susan Renken, testified. (Notably, defendant did not testify at the hearing.) Moreover, the court has credited certain facts set forth in the government's February 4, 2004 submission to the court – including those contained in footnote three on page fifteen (*i.e.*, concerning the identity, location, *etc.* of various agents and police officers during the interview). Those facts do not conflict with any facts presented or argued by defendant.

**B.** **The Agents' Entry into Defendant's Home and Subsequent Interrogation of Defendant and Defendant's Subsequent Confessions**

First, the agents conducted surveillance from a distance. Subsequently, at approximately 10:40 p.m. on November 13, 2003, more than ten agents of the aforementioned entities converged upon defendant's house. They did not have an arrest warrant or a search warrant at that time. McCune and at least some, if not all, of the other agents were armed with guns and in possession of handcuffs. McCune, Kissinger, and Sergeant James Lee of the Lake Bluff Police Department approached the door, along with Detectives Ward and Farrow of the Gurnee Police Department. McCune and Kissinger were in plainclothes, and Lee was in uniform. McCune believes that Lee had an exposed weapon. Farrow was carrying a long rifle in his arms. McCune does not believe that any of the other agents "brandished" their firearms that evening.

When McCune, Kissinger, and Lee approached the door, other agents remained outside of the house, positioned variously on the rear perimeter of the house and off to the side in the front of the house. McCune testified that they were conducting surveillance so that they would know whether someone left the location, and not to prevent any occupant from leaving. McCune knocked on the door and rang the doorbell. Mrs. Renken, who was wearing her robe, opened the door. The agents identified themselves to her and indicated that they wanted to speak to her husband and/or her.

The parties dispute whether, thereafter, Mrs. Renken invited the agents in (as the government contends) or the agents simply went inside (as Mrs. Renken contends).[3] The agents entered the home and, once inside, asked Mrs. Renken who else was in the residence. She stated

---

[3] Their dispute is not material herein, as it is what transpired following the agents' entry into the house that governs the admissibility of defendant's confessions.

that defendant was upstairs in the shower and their baby in the bedroom, asleep. The agents

stated that they wanted to verify who was in the house for their own safety and that they were

going upstairs to do so.[4] In particular, they were concerned about whether someone in the house

might have a weapon, as the suspect in question had used a weapon.

McCune and the other agents subsequently went upstairs. The bathroom was located at

the top of the stairs, across from the exit down the stairway. McCune opened the bathroom door

(which was partially closed), indicating his FBI affiliation as he did so. He then opened the

shower curtain and observed defendant taking a shower. McCune told defendant that once he

was done showering, McCune wanted to talk with him. As defendant finished his shower,

McCune stood in the doorway with the door partially opened. Ward and Farrow first verified the

baby's location and then joined McCune (and presumably Kissinger) in waiting for defendant

outside of the bathroom.

After showering, defendant dressed under McCune's watchful eyes. McCune stated that

he wanted to speak to defendant, and defendant agreed. McCune and defendant walked

downstairs, with at least one agent walking in front of defendant and at least one agent walking

behind him. They then proceeded into the kitchen. Ward and Farrow remained on the second

floor of the house at that time.

Defendant moved an olive parka from one of the chairs and then sat at the kitchen table.

McCune sat at the table, as well. Kissinger was also present, but McCune could not recall

whether he was sitting. An Agent Pasquesi of the FBI was present for portions of the interview

---

[4] McCune testified that Mrs. Renken "complied" with their entry and search upstairs. Mrs. Renken testified that the agents did not ask permission to go upstairs or to look around the house, but instead simply did so. The parties' testimony in this regard does not actually conflict, and any arguable discrepancy is immaterial herein.

that followed, although McCune could not recall when Pasquesi entered the kitchen. Other agents who were present in the kitchen during the interview included Detective Farrow from the Gurnee Police Department and John Boyd (whose affiliation is not apparent from the record). During the interview, police officers were standing between defendant and the front door.

None of the agents advised defendant of his "*Miranda* rights" (*i.e.*, the rights required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), to be given to suspects subjected to custodial interrogations) before or when the interview began. Moreover, they did not advise him that he was under arrest, that he was free to leave and terminate any questioning, or that he did not have to answer their questions. McCune also testified that neither he nor any of the other agents drew their weapons or restrained defendant. He also testified that they made no promises or threats and that defendant did not make any requests subsequently denied by them. McCune further testified that defendant did not make any complaints.

The agents began the interview by asking defendant what he had done and where he had been that day. After defendant provided answers to their questions, McCune asked defendant where his car was, informed him of the bank robbery, and stated that he believed that defendant was involved in the robbery.

Defendant denied any involvement in or knowledge of the bank robbery. In response, McCune told defendant that he believed that defendant was not being truthful with them. McCune proceeded to tell defendant that he matched the description of the suspect, including in terms of his car and the parka. At various points, the agents told defendant that it was in his best interest to cooperate and tell the truth.

By McCune's testimony, their tone was "conversational" until he told defendant that he

-5-

did not believe him. At that point, defendant became more "tense,"and the "tone" and "aggressiveness" of McCune's questions "increased." McCune told defendant that he could see that defendant was in a poor financial condition simply by virtue of the condition of his house. At that point, defendant's memory did not yet seem "sway[ed]."

Next, Detective Gonzales of the Gurnee Police Department entered the kitchen and told defendant that a bloodhound had scented a path from a bicycle (believed to have been used in connection with the robbery) to defendant's Blazer. Gonzales contended that fact was a good indication that defendant was involved and that he needed to tell the truth. Gonzales then asked defendant whether he had "made a mistake." At that time, defendant changed his tone, put his head down, and admitted his involvement in the robbery. The agents asked defendant where the gun and the money were, and defendant told them.[5]

It was only after all of the above transpired that defendant was first advised of his rights. This occurred at approximately 11:02 p.m., after McCune stopped the interview and Pasquesi went to his car and returned with an "Advice of Rights" form. The agents read the form to defendant to advise him of his *Miranda* rights. Defendant signed the form.

Subsequently, defendant and the agents went through the robbery in detail. The agents asked defendant what happened, and McCune took notes as defendant responded. Subsequently, McCune prepared a written statement (based upon his notes), which he asked defendant to review for accuracy and sign. Defendant reviewed the statement, made and initialed corrections, and signed the statement. The statement included acknowledgments that it was freely and voluntarily made and that defendant was 47 years of age, could read and write, was not on any medication,

---

[5] These statements constitute defendant's "first confession," and all subsequent statements made by him (both written and oral) constitute defendant's "second confession," as referenced herein.

and was of sound mind. During the interview, defendant also revealed that he had a college education. Sometime between 11:02 p.m. and 12:30 a.m., defendant also signed a Consent to Search form.

At approximately 12:30 a.m., the interview concluded, and the agents arrested defendant. The agents left defendant's home with him in tow around 12:40 a.m. (McCune had been in defendant's presence continuously from the time that he encountered defendant in the bathroom through the time that they departed together from defendant's home.) Defendant subsequently accompanied the agents to where his car was parked and led them to other evidence relating to the bank robbery.

## C.   Other Circumstances Surrounding Defendant's Interrogation

When McCune and the other agents initially went upstairs, two police officers asked Mrs. Renken to go into the living room and sit on the couch, stating that they wanted to ask her some questions. Thereafter, Mrs. Renken remained seated and in the company of at least two police officers until the time that all the agents left the home and brought her husband with them.

Mrs. Renken observed her husband being walked down the stairs after his shower. From where she was sitting in the living room, she  was unable to see defendant when he was in the kitchen with the agents. She specifically requested an opportunity to speak with him, but the agents told her that she could not do so and that they wanted her to remain where she was. By virtue of where they were standing, the police officers in the living room blocked her ability to leave the living room. Mrs. Renken was not allowed to leave the living room area from the time she sat down on the couch until the time the agents left the house with her husband.

During the interview with defendant, Mrs. Renken observed at least six agents entering

-7-

and leaving the house through the front door. She further testified that she had no opportunity to prohibit or limit individuals from coming in and out of the door, and, instead, they came and went as they pleased.

## II. Analysis

### A. A Confession Must Comply with *Miranda* and Be "Voluntary" within the Meaning of the Constitution to Be Admissible.

Prior to the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), the admissibility of confessions was governed solely by their "voluntariness" (within the meaning of the Fifth and Fourteenth Amendments to the United States Constitution). *See Oregon v. Elstad*, 470 U.S. 298, 304, 105 S. Ct. 1285 (1985).[6] A confession is voluntary if, "in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002) (internal quotations and citation omitted). *See also Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S. Ct. 1246 (1991) (confession is "involuntary" or "coerced" if the "totality of the circumstances" demonstrates that the suspect did not make the decision to confess of his own free will). This determination is an objective one, made from the perspective of a reasonable person in the shoes of the suspect. *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). The government bears the burden of proof to establish by a preponderance of the evidence that a defendant's confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619 (1972); *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir. 1990) (citation omitted).

---

[6] The voluntariness inquiry is the same under the Fifth and Fourteenth Amendments. *Lam v. Kelchner*, 304 F.3d 256, 264 n.5 (3rd Cir. 2002).

In *Miranda*, the Supreme Court held that certain warnings are required to be administered to a suspect in order for a statement given by him during a custodial interrogation to be admissible in evidence. *Miranda*, 384 U.S. at 444. These required warnings, now known as "*Miranda* rights*," are, in essence: that the suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

The rules established by *Miranda* are prophylactic – their purpose is to guard against infringement of suspects' Fifth Amendment rights against self-incrimination. *See Elstad*, 470 U.S. at 305. More specifically, the *Miranda* Court was concerned with the "inherently compelling pressures" attendant to in-custody interrogation of suspects, which "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. Accordingly, *Miranda* established an exclusionary rule pursuant to which unwarned statements made by suspects during custodial interrogations may not be admitted in evidence in the government's case-in-chief. *Id.* at 471-75. Whether this rule applies in a given case depends upon whether the suspect was in custody during the interrogation, which courts must analyze by examining the totality of the circumstances. *See Sprosty v. Buchler*, 79 F.3d 635, 640 (7th Cir. 1996) (citations omitted).

Notably, the effects of the Court's establishment of this prophylactic rule include the exclusion of "unwarned statements that are otherwise voluntary." *Elstad*, 470 U.S. at 307. Moreover, following *Miranda*, a confession must comply with its dictates and be "voluntary" within the meaning of the Constitution (as discussed *supra*) to be admissible. *See, e.g., Dickerson*

*v. United States*, 530 U.S. 428, 444, 120 S. Ct. 2326 (2000) ("[t]he requirement that *Miranda*

warnings be given does not, of course, dispense with the voluntariness inquiry"); *United States v.

D.F.*, 115 F.3d 413, 420-21 (7th Cir. 1997). However, the Supreme Court has made the cautionary

observation that "cases in which a defendant can make a colorable argument that a self-

incriminating statement was 'compelled' despite the fact that the law enforcement authorities

adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433, 104 S. Ct.

3138 (1984).

In *Oregon v. Elstad*, 470 U.S. 298, 300, 105 S. Ct. 1285 (1985), the Supreme Court faced

the question of "whether an initial failure of law enforcement officers to administer [*Miranda*

warnings], without more, 'taints' subsequent admissions made after a suspect has been fully

advised of and has waived his *Miranda* rights." The Court resolved the question by holding that

"a suspect who has once responded to unwarned yet uncoercive questioning is not thereby

disabled from waiving his rights and confessing after he has been given the requisite *Miranda*

warnings." *Elstad*, 470 U.S. at 318. The Court further explained: "It is an unwarranted

extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by

any actual coercion or other circumstances calculated to undermine the suspect's ability to

exercise his free will, so taints the investigatory process that a subsequent voluntary and informed

waiver is ineffective for some indeterminate period." *Id.* at 309.[7]

---

[7] In reaching its holding, the Court examined the arguments advanced in favor of suppression –
most relevant for our purposes, that the subsequent statement should be suppressed under the fruit of the
poisonous tree doctrine. The Court then proceeded to explore the nature of the rights accorded by
*Miranda*, emphasizing that *Miranda* warnings are prophylactic measures intended to secure suspects'
Fifth Amendment rights. In that vein, the Court explained that "[a] Miranda violation does not *constitute*
coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all
unwarned statements." *Elstad*, 470 U.S. at 307 n.1. Explaining further, the Court distinguished between
"procedural *Miranda* violation[s]" and Fourth Amendment violations in the context of the "fruit of the

Central to its holding, the Court instructed that, where the first statement is unwarned, *but not coerced (i.e., voluntary)*, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Id. See also Wilson v. O'Leary*, 895 F.2d 378, 381 (7th Cir. 1990) ("[a]fter [*Elstad*], obtaining a statement in violation of *Miranda* does not prevent the police from using in court later statements given after the administration of the essential warnings, provided both statements are voluntary").

### B.   Defendant's First Confession Must Be Suppressed Because of the Agents' Failure to Administer His *Miranda* Warnings.

Whether defendant was entitled to receive *Miranda* warnings in the first instance (*i.e.*, prior to his first confession) depends upon whether he was subjected to a custodial interrogation. The government urges that defendant's first confession should be deemed admissible because defendant was not in custody during his questioning, and his unwarned confession, therefore, was not violative of *Miranda* and, moreover, was voluntary. Defendant claims that the first confession must be suppressed because the agents subjected him to a custodial interrogation but did not administer his *Miranda* warnings. He also contends that he was coerced into confessing.

#### 1.   Defendant was interrogated.

As an initial matter, it is beyond dispute that the agents interrogated defendant, and the government does not contend otherwise. *Miranda* and its progeny define "interrogation" as "questioning initiated by law enforcement officers" (*see Miranda*, 384 U.S. at 344) or the

---

poisonous tree" doctrine. *Id.* at 306. It observed that Fourth Amendment violations "have traditionally mandated a broad application of the 'fruits' doctrine." *Id.* However, it noted, "The *Miranda* exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment, itself. It may be triggered even in the absence of a Fifth Amendment violation." *Id.* This logic underlay the Court's decision not to extend the "fruit of the poisonous tree" doctrine to *Miranda* violations that result in unwarned, but not involuntary, statements.

"functional equivalent" of such express questioning (*see Arizona v. Mauro*, 481 U.S. 520, 526, 107 S. Ct. 1931 (1987)). More specifically, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" also constitute "interrogation" for *Miranda* purposes. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682 (1980) (footnote omitted). Here, the agents' express questioning of defendant constituted an interrogation.

### 2.    Defendant was in custody.

A suspect is in "custody" within the meaning of *Miranda* when he is either formally under arrest "or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 477. In this context, custody depends upon the totality of the circumstances, with the ultimate inquiry being "whether there is a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517 (1983) (internal quotations and citation omitted). Because defendant undisputedly was not under arrest at the time of the confessions at issue, the latter inquiry is in order. The test for ascertaining the existence of custody is an objective one that focuses upon whether "a reasonable person in the suspect's position would feel free to end the conversation or to leave the agents." *United States v. Madoch*, 149 F.3d 596, 601 (7th Cir. 1998) (citations omitted); *see also United States v. Martin*, 63 F.3d 1422, 1430 (7th Cir. 1995) ("[c]ustody implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion").

Guided by these principles, courts look to psychical and psychological factors in determining the existence of custody. The Seventh Circuit has identified specific factors that

-12-

courts may consider in making this determination. They include: "whether and to what extent the person has been made aware that he is free to refrain from answering questions []; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination []; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed []; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene []." *Sprosty*, 79 F.3d at 641 (internal citations omitted). Moreover, the purpose and place of the interrogation are relevant to this determination. *United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988). Here, the totality of the circumstances establishes that a reasonable person in defendant's position would not have felt free to end the conversation or to leave the agents, dictating that he was in "custody" for *Miranda* purposes. *See Madoch*, 149 F.3d at 601.

As a preliminary matter, it has long been the law that an individual can be in custody within the meaning of *Miranda* even when he is within his own home. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 89 S. Ct. 1095 (1969); *Madoch*, 149 F.3d at 601. Moreover, the Seventh Circuit has indicated that police domination of the questioning environment is relatively more probative of custody than the location of the questioning. *Sprosty*, 79 F.3d at 641-42 (upholding district court's finding of custody and concluding that the familiarity of the defendant's surroundings was not dispositive and that "the degree to which the police dominated the scene" was more important). *See also United States v. Griffin*, 922 F.2d 1343, 1355 n.15 (8th Cir. 1990) ("it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private

residence"). The Supreme Court has indicated that an interrogation that takes place in an environment dominated by the police is more likely to be deemed custodial than one that does not. *See Berkemer*, 468 U.S. at 438. In fact, it was concern about a police-dominated atmosphere in which the suspect is cut off from family and/or friends and its impact upon a suspect's will to resist self-incrimation during interrogation that lies at the very heart of the Court's decision in *Miranda*. *See Miranda*, 384 U.S. at 451.

In the case at bar, the agents did not merely dominate, but instead virtually controlled the environment in which the questioning took place (*i.e.*, defendant's home). McCune remained in defendant's presence *continuously* – beginning from the time that he confronted defendant in the bathroom while defendant was showering, continuing through the time that he and other agents escorted defendant down to his kitchen and subsequently interrogated defendant therein, and up until the time that they arrested defendant and took him from his home. From these facts, it is clear that McCune's objective was not only to interrogate defendant, but also to guard him. *See, e.g., Sprosty*, 79 F.3d at 642 (finding custody where it was apparent that the role of one officer at the scene was to guard the defendant, rather than to execute the search warrant). Further, agents stood between defendant and the doorway during his interrogation. Some other agents remained with defendant's wife in the living room and restricted both her movement and her ability to approach her husband, who was in the kitchen (thus effectively separating husband and wife). While they were doing so, yet other agents entered and exited the house *at will*. In total, more than ten agents were present at defendant's home that evening.[8]

---

[8] The government cites *Hocking* in support of its contention that defendant was not in custody. In so doing, the government concedes that the "police presence" was greater here than in *Hocking* (where only two agents questioned the defendant in her home). *See Hocking*, 860 F.2d at 770. However, the government essentially claims that this distinction is irrelevant because the greater police presence in the

-14-

All of these facts demonstrate that it was the government, and not defendant or his wife, who controlled the environment in which the questioning took place. This finding strongly militates in favor of the conclusion that defendant was in custody. *See Berkemer*, 468 U.S. at 438; *Miranda*, 384 U.S. at 451; *Sprosty*, 79 F.3d at 641-42; *Griffin*, 922 F.2d at 1351-52. Indeed, the sheer fact that defendant remained under the watchful eyes of the FBI even while performing the very intimate tasks of showering and dressing is extremely probative of his lack of freedom to interrupt or terminate his conversation with the agents and/or to leave the scene. *See, e.g.*, *Madoch*, 149 F.3d at 601 (where interrogation took place in suspect's home, fact that agent was present in bathroom while the defendant expressed her breast milk "was eloquent evidence that she could not just walk out the door and terminate her conversation with the agents").

Moreover, although the pre-*Miranda* questioning was not prolonged (lasting for fewer than twelve minutes), the court finds that it was aggressive and accusatory. At least six agents were present in the kitchen during part or all of defendant's interrogation, and at least two agents participated in the interrogation. McCune and the others confronted defendant with evidence contradicting his protestations of innocence and flatly told him that they did not believe him.[9]

_____

present case was motivated by concerns for "officer safety." This argument is unavailing. First, the relatively "greater police presence" in the present case is but one of numerous critical differences between the circumstances of Hocking's and defendant's interrogations. Moreover, and in any event, the *reason* for the large police presence bears no relevance to whether defendant was in custody – it is instead the likely *effect* of the police presence that matters. *See A.M. v. Butler*, No. 02-2882, 2004 U.S. App. LEXIS 3944 (7th Cir. Mar. 2, 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526 (1994)) ("'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned'"); *see also Berkemer*, 468 U.S. at 442 ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

[9] Relatedly, the agents' manifestly evident purpose in questioning defendant – their primary, if not sole, suspect in the bank robbery – was to obtain potentially inculpatory information. Although this fact, alone, is not enough to warrant a finding of custody, "the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him

Moreover, although McCune described the interrogation as "conversational," he conceded that his "tone" and the "aggressiveness" of his questioning "increased" after he told defendant that he did not believe him. These facts also strongly support a finding of custody.

As set forth above, defendant was not made aware that he was free to refrain from answering questions. Defendant received warnings notifying him of his rights in that regard (*i.e.*, his *Miranda* rights) only after he had made his first confession. In the court's view, these facts also weigh in favor of finding custody, as a reasonable person in defendant's position would have been less likely to feel free to end the conversation or to leave the agents in the absence of such warnings. *See United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (finding custody where the suspect was not informed that he was free to leave or that he was not required to answer questions). *Cf., Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711 (1977) (finding absence of custody where the suspect was informed that he was not under arrest and actually left the police station "without hindrance" following the interview).

Consideration of the above circumstances in their totality requires the conclusion that defendant was in custody. Because the agents subjected defendant to a custodial interrogation, their initial failure to administer his *Miranda* warnings requires the exclusion of his first confession.

## C.    The Second Confession May Be Admitted in Evidence Because It Was Preceded by *Miranda* Warnings and It Was Voluntary.

Under *Elstad*, the admissibility of defendant's *Mirandized* second confession turns initially on whether his first confession was voluntary and (in pertinent part), if so, whether his

---

and this awareness contributes to the suspect's sense of custody." *Griffin*, 922 F.2d at 1348 (internal quotations and citation omitted).

second confession was voluntary. In other words, the government's failure to *Mirandize* defendant prior to his first confession does not, itself, poison defendant's subsequent confession or render it involuntary.

The government contends that the second confession should be deemed admissible because it was preceded by a reading of defendant's *Miranda* rights and, moreover, was voluntary. Defendant asks this court to suppress his second confession, claiming that it was tainted by the government's failure to administer his *Miranda* warnings in advance of and/or the government's coercion of his first confession (*i.e.*, that it should be suppressed as a fruit of the poisonous tree).[10] The thrust of defendant's somewhat haphazard argument appears to be that because his first confession was unwarned and the product of a coercive environment, it was "involuntary," which rendered his second confession necessarily "involuntary," as well.[11] Conversely, the government argues that because the non-*Mirandized* first confession was voluntary, it does not provide a basis for suppressing the second confession.

### 1. Defendant's first confession was voluntary.

In the case at bar, there is evidence that the environment in which the interrogation took

---

[10] In *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963), the Supreme Court held that evidence and witnesses discovered as a result of a search that was violative of the Fourth Amendment must be excluded from evidence. Following *Wong Sun*, evidence discovered as a consequence of the "exploitation" of such a constitutional violation must be excluded as "fruit of the poisonous tree." *Wong Sun*, 371 U.S. at 488.

[11] In support of his claim, defendant also argues that the police violated not only his Fifth Amendment rights, but also his Fourth Amendment rights. This argument exceeds the scope of defendant's initial (untimely) motion and the January 30, 2004 hearing concerning the voluntariness of his statements. In any event, the issue is not properly before the court, and the court will not consider it. Likewise, the court declines to consider defendant's arguments concerning the admissibility of certain physical evidence that he claims constitute the fruits of his involuntary confession, as the issue is not properly before the court. Regardless, because this court finds that *both confessions* were voluntary, any such argument would necessarily fail.

place was somewhat coercive (in the sense that the agents controlled the questioning environment, *etc.*).[12] However, consistent with the prevailing definition of voluntariness, "the test for a voluntary confession is *whether the defendant's will was overborne* at the time he confessed." *Hocking*, 860 F.2d at 774 (internal quotations and citation omitted). Factors relevant to the voluntariness of a confession include the defendant's age, education, intelligence level, and mental state; the length of his detention; the nature of the interrogation; the inclusion of advice about constitutional rights; the use of physical punishment; and narcotics, alcohol, and fatigue. *United States v. Gillaum*, No. 02-4015, 2004 U.S. App. LEXIS 761 (7th Cir. Jan. 20, 2004).

Although "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" (*see Huerta*, 239 F.3d at 871), it is by no means an absolute indicator of involuntariness. Rather, consistent with pre-*Elstad* jurisprudence concerning the voluntariness of confessions, the inquiry remains focused on whether the totality of the circumstances establishes that the confession was the product of "physical abuse, psychological intimidation, or deceptive interrogation tactics *that have overcome the defendant's free will*." *Abdulla*, 294 F.3d at 836 (internal quotations and citation omitted) (emphasis added). *See, e.g., Watson v. Detella*, 122 F.3d 450, 454 (7th Cir. 1997) (notwithstanding police officer's kicking of the defendant's head while making arrest, and the fact that the defendant made his unwarned first confession while waiting 45 minutes for medical treatment, there was no official coercion for purposes of *Elstad* analysis; the kicking did not occur during interrogation or in effort to compel the defendant to confess); *United States v. Orso*, 266 F.3d 1030, 1038-1040 (9th Cir. 2001) (concluding that *Elstad* creates a bright-

---

[12] In *Elstad*, the Court found "none of the earmarks of coercion" with respect to the defendant's first statement and found that it was voluntary. *Elstad*, 470 U.S. at 316. Specifically, the Court noted that neither the environment nor manner of the interrogation was "coercive." *Id.* at 315.

line rule that "focuses only on voluntariness" and finding that "reprehensible" police conduct (*i.e.*, the use of deception concerning evidence against the suspect) plus other circumstances of the suspect's interrogation (including a 35-minute car ride during which she was seated next to a government agent) did not render the defendant's first confession involuntary for purposes of *Elstad* analysis).

These cases also make clear that the threshold for "involuntariness," remains rather high even in the context of an *Elstad* analysis. *See also Madoch*, 149 F.3d at 600-01 (finding a *Miranda* violation, but concluding "nothing in the record persuades us that [the defendant's] statements were involuntary as a constitutional matter," where agents entered the defendant's home at 7:00 a.m., ordered the defendant into kitchen, reached for gun when she started towards other room in which her baby was located, ran through the house yelling, handcuffed the defendant's husband, instructed the defendant not to answer telephone, interrogated the defendant for approximately five or five and a half hours, and allowed the defendant to get dressed and go to the bathroom to express her breast milk only in the presence of an agent). *Cf., Wilson*, 895 F.2d at 383 (upholding finding that initial confession was involuntary, where the defendant was dragged into vacant lot, surrounded by friends of victim, and grilled by victim's husband, and deputy sheriff had handed a pistol to either the victim's husband or friend and then left the scene; the defendant was entitled to fear for his life).

Here, notwithstanding that the environment was sufficiently coercive to support a finding of "custody" for Miranda purposes, it was not so coercive as to render defendant's confession involuntary. There is insufficient evidence from which this court could conclude that defendant's will was overcome. At the time of his confession, defendant was a 47-year old, college-educated

-19-

individual. There is no evidence (or claim) that he was subjected to any physical punishment. He affirmed in writing that he was not under the influence of medication and was of sound mind. The interrogation lasted for fewer than twelve minutes. The government has demonstrated by a preponderance of the evidence that defendant's first confession, while unwarned, was voluntary and, thus, is admissible.

### 2. Defendant's second confession was voluntary.[13]

Given that defendant's first confession was voluntary, the admissibility of defendant's *Mirandized* second confession is contingent solely upon whether it was voluntary, itself. *See Elstad*, 470 U.S. at 309. Defendant contends that the coercive environment that existed at the time of his first confession remained at the time of his second confession.[14] However, in *Elstad*, the Court specified that,

---

[13] This Court notes that if defendant's initial statement were, instead, coerced and involuntary in fact, rather than uncoerced and voluntary, it would be inclined to find the subsequent statement involuntary, as well. The Supreme Court has instructed that the voluntariness of a warned confession that follows an unwarned, involuntary confession depends upon "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Elstad*, 470 U.S. at 310. The central question is whether there was a "break in the stream of events . . . sufficient to insulate" the second confession from the unlawfulness of the first. *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992). Other relevant factors include whether the suspect remained in custody following the time of the first confession up until the time of the second and whether he (or the authorities) initiated contact with the authorities before his second confession. *Holland*, 963 F.2d at 1050. On all of these factors, the existing facts would weigh in favor of finding that the second confession should be excluded as involuntary.

[14] Although defendant has not expressly contended that his waiver of his *Miranda* rights was involuntary, he raised this point in the context of his receipt of the Advice of Rights form. Again, the Supreme Court has held that the government's subsequent advisement of a suspect's Miranda rights is sufficient to vitiate an initial failure to do so. *See Elstad*, 470 U.S. at 314. In any event, there is insufficient evidence of coercion for defendant to establish that his waiver of his rights was not knowing and voluntary. *See, e.g., Watson*, 122 F.3d at 454; *see also Colorado v. Connelly*, 479 U.S. 157, 169, 107 S. Ct. 515 (1986) (a waiver of *Miranda* rights must be "'voluntary' to be effective against an accused"). Instead, the government has demonstrated by a preponderance of the evidence that defendant's waiver of his *Miranda* rights was voluntary.

> A subsequent administration of *Miranda* warnings to a suspect who has
> given a *voluntary but unwarned* statement ordinarily should suffice to remove the
> conditions that precluded admission of the earlier statement. In such
> circumstances, the finder of fact may reasonably conclude that the suspect made a
> rational and intelligent choice whether to waive or invoke his rights.

*Elstad*, 470 U.S. at 314 (emphasis added). The Court also instructed that, in making such a

voluntariness determination, courts should look to "the surrounding circumstances and the entire

course of police conduct." *Id.* at 318. Ultimately, "[t]he fact that a suspect chooses to speak after

being informed of his rights is . . . highly probative." *Id.*

Here, the circumstances surrounding the first confession, which did not render it

involuntary, likewise did not render the second confession involuntary. Moreover, and in any

event, the agents' reading of defendant's *Miranda* rights and the fact that he chose thereafter to

make a full confession rather than to invoke his rights demonstrates by a preponderance of the

evidence that defendant's subsequent confession was voluntary. *See Elstad*, 470 U.S. at 318. The

written confession included statements to the effect that it was freely and voluntarily made, which

further supports the inference that it was voluntary. *Hocking*, 860 F.2d at 774-75 (concluding that

written confession was voluntary where it included the statement that it was made "without any

threats or promises;" there was "nothing in the record that reasonably support[ed] the inference

that the agents' statements and actions were *so coercive* as to overcome [the defendant's] free

will") (emphasis added); *see also United States v. Gupta*, 183 F.3d 615, 619 (7th Cir. 1999) ("[a]

suspect's willingness to make exactly the same statement a second time, following an advice of

rights and a written waiver that drives home the seriousness of the steps about to be taken,

demonstrates that the suspect is set on his course, and thus the statement cannot be attributed to

'compulsion' in violation of the Constitution").

The government has met its burden of showing by a preponderance of the evidence that defendant's second confession was voluntary. Thus, it is admissible.[15]

## III.   Conclusion

Based on the foregoing, the government's motion to admit defendant's statements is granted in part and denied in part. Likewise, defendant's motion to suppress is granted in part and denied in part. Defendant's first confession shall be suppressed, but his second confession shall not be suppressed and may be admitted in evidence.

**Enter:**

_____

**David H. Coar**
**United States District Judge**


**Dated:  March 18, 2004**

_____

[15] Subsequent Supreme Court and Seventh Circuit jurisprudence has left unanswered certain questions concerning the effect of an unwarned, involuntary initial statement upon the admissibility of a subsequent statement. Further, the Court's decision in *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326 (2000), has generated some debate concerning the *Elstad* decision, itself (*e.g.*, *Miranda*'s status *vis a vis* whether it established a constitutional rule). However, the court remains constrained by *Elstad* and its progeny to focus only upon the voluntariness of defendant's confessions. The court finds the ultimate result in this case somewhat distasteful chiefly because of its strong suspicion that the government *deliberately* interrogated defendant without giving him his *Miranda* warnings so as to increase the likelihood that defendant would confess on the spot. Notwithstanding that the situation was clearly – and by design – custodial, the FBI undertook to interrogate defendant without providing the warnings that the FBI already provided as a matter of course at the time the *Miranda* decision was issued, nearly forty years ago!  *See Miranda*, 384 U.S. at 483-85. Moreover, *immediately after* defendant uttered his first confession, the agents stopped the interview so that one of them could retrieve an Advice of Rights form from his car. The government's conduct in this regard did not render defendant's first confession or second confession involuntary and did not overbear his will. But the court perceives a very real danger that decisions such as this one will encourage the government to emulate such conduct in the future, as it is clearly efficient and, in the aftermath of *Elstad*, reasonably safe. If that occurs on a widespread basis, the integrity and worth of suspects' Fifth Amendment rights will be eroded – if not in a given case, at least in principle.